**Fred GARDNER and Concerned Citizens for Little Canyon Mountain, an unincorporated association, Plaintiffs,**

v.

**UNITED STATES BUREAU OF LAND MANAGEMENT, Defendant.**

**Civil No. 07–1722–SU.**

United States District Court,
D. Oregon.

June 15, 2009.

Marianne Dugan, Eugene, OR, for Plaintiffs.

Karin J. Immergut, United States Attorney, District of Oregon, Stephen J. Odell, Assistant United States Attorney, Portland, OR, for Defendant.

## ORDER

KING, District Judge:

The Honorable Patricia Sullivan, United States Magistrate Judge, filed Findings and Recommendation on March 11, 2009. Plaintiffs filed timely objections to the Findings and Recommendation.

When either party objects to any portion of a magistrate's Findings and Recommendation concerning a dispositive motion or prisoner petition, the district court must make a *de novo* determination of that portion of the magistrate's report. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). This court has, therefore, given *de novo* review of the rulings of Magistrate Judge Sullivan.

This court ADOPTS the Findings and Recommendation of Magistrate Judge Sullivan (# 45) dated March 11, 2009 in its entirety.

IT IS HEREBY ORDERED that Gardner's Motion for Summary Judgment (# 5) is DENIED and BLM's Cross Motion for Summary Judgment (# 18) is GRANTED.

## FINDINGS AND RECOMMENDATION

SULLIVAN, United States Magistrate Judge:

Fred Gardner and the Concerned Citizens for Little Canyon Mountain (collectively "Gardner") bring this action against the United States Bureau of Land Management ("BLM") seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Gardner asserts violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f; the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1785; and BLM's own regulations, 43 C.F.R. §§ 8340–42, when BLM declined to close Little Mountain Canyon to off-road vehicle use. Gardner challenges the manner in which the BLM is managing an area of public land near private homes in an area known as the Little Canyon Mountain ("LCM"),[1] particularly with respect to the use of off-road vehicles ("ORVs").[2] Gardner seeks judicial review of BLM's failure to: (1) prepare an adequate environmental analysis of impacts, pursuant to the NEPA, 42 U.S.C. § 4332(c)(I) and 40 C.F.R. Parts 1500–08, prior to implementing the Fuel Reduction Project; (2) comply with the requirements of FLPMA, 43 U.S.C. § 1732(b), and 43 C.F.R. § 8341.2(a), in managing LCM; and (3) comply with its own regulations, 40 C.F.R. §§ 8340–42, and Executive Order 11644, amended by Executive Order 11989, mandating closure of public lands to ORV use.

Before the court are the parties' cross-motions for summary judgment. Oral argument was heard on these motions and, for the reasons that follow, the BLM's Cross–Motion for Summary Judgment pursuant to the APA should be granted; and Gardner's Motion for Summary Judgment should be denied.

---

1. Little Canyon Mountain is located in Grant County, Oregon, BLM Prineville District and is part of the more than 15 million acres of federal lands in Oregon managed by the BLM.

2. The term "OHV" refers to off-highway vehicle and is often used interchangeably with the term ORV.

*Background*

## I. Statutory and Regulatory Framework

### A. *Federal Land Policy Management Act*

In 1976, Congress enacted FLPMA, 43 U.S.C. §§ 1701–1784, to provide "the first comprehensive, statutory statement of purposes, goals and authority for the use and management of about 448 million acres of federally-owned lands administered by the Secretary of Interior through the Bureau of Land Management." S.Rep. No. 583, 94th Cong., 1st sess. 24 (1975). BLM is an agency within the Department of the Interior. FLPMA created a framework for governing BLM's management of these lands and reflected a significant change in federal policy. Prior to the enactment of FLPMA, lands held by BLM (and its predecessor the General Land Office) were viewed as only temporarily within the custody of the United States and it was expected that their ultimate destiny was private ownership. *See* Leshy, *Wilderness and Its Discontents– Wilderness Review Comes to the Public Lands,* Ariz.St.L.J. 361, 362–63 (1981). Under FLPMA, however, BLM lands were to be held in permanent federal ownership unless, as a result of land use planning, the disposal of a particular parcel would serve the national interest. *See* 43 U.S.C. § 1701(a)(1).

To assist in the management of public lands, FLPMA requires that the BLM "develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C. § 1712(a). Congress required that regulations and plans for the protection of public land areas of critical concern be promptly developed. 43 U.S.C. § 1701(a)(11). These land use plans, which the BLM regulations denote "resource management plans" ("RMPs"), *see* 43 C.F.R. § 1601.0– 5(n) (2005), project both the present and future use of the land. 43 U.S.C.

§ 1701(a)(2). Proposed RMPs are subject to a mandatory period of public notice and comment, *see* 43 C.F.R. § 1610.2, and, once adopted, will "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0–2. Among other things, FLPMA prohibits the BLM from taking actions inconsistent with the provisions of RMPs. *See Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 69, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("*SUWA* "); 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands . . . in accordance with the land use plans developed . . . ."); 43 C.F.R. § 1610.5–3 ("All future resource management authorizations and actions . . . shall conform to the approved plan."). These plans may be amended. 43 C.F.R. § 1610.5–5. To do so, BLM must prepare an environmental assessment or an environmental impact statement, *see id.,* and submit the proposed amendment to public notice and comment in the same way that the plan was originally prepared. 43 C.F.R. § 1610.2.

In FLPMA, Congress declared as a national policy that public lands held by the BLM were to be managed on the basis of multiple use and sustained yield unless otherwise specified by law. 43 U.S.C. § 1701(a)(7); *see also* 43 U.S.C. § 1732(a) (FLPMA directs BLM to manage public lands "under principles of multiple use and sustained yield."). Congress also declared as national policy, however, that:

> [T]he public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and

domestic animals; and that will provide for outdoor recreation and human occupancy and use . . . .

43 U.S.C. § 1701(a)(8). Further underscoring the BLM's duty to protect the environment is the statutory requirement that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

### B. *Off-road Vehicle Executive Orders and Federal Regulations*

ORV use is one of the multiple uses BLM provides for and is required to balance in managing the public lands. In response to increased ORV use on public land, President Nixon issued an Executive Order to "establish policies and provide procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." Exec. Order No. 11644, 37 Fed.Reg. 2877 (Feb. 8, 1972). The stated reason for that order was to further the purpose and policy of NEPA; it established criteria by which federal agencies were to develop regulations and administrative instructions for the designation of areas and trails on which ORVs would be permitted. *Id.* § 3. It also required agencies to "monitor the effects" of ORV use on the public lands and "[o]n the basis of the information gathered, they shall from time to time amend or rescind designations of areas or other actions taken pursuant to this order as necessary to further the [NEPA]." *Id.* § 8.

In 1977, President Carter issued Executive Order No. 11989, amending Executive Order 11644, which strengthened BLM's obligation to protect public lands from the harm caused by ORV use. *See* Exec. Order 11989, 42 Fed.Reg. 26959 (May 24, 1977). The amended Executive Order provided that notwithstanding BLM's designations of public land use under the applicable RMP, BLM "shall . . . immediately close" any area or route to ORVs whenever it determines that ORV use "will cause or is causing considerable adverse effects" to wildlife, wildlife habitat, and other natural resources. *See Id.* § 2 (amending Exec. Order 11644, § 9(a)). Under the order, the closure must remain in place until the adverse effects have been eliminated. *Id.* The Department of Interior adopted regulations to implement the Nixon and Carter Executive Orders, FLPMA, and other federal statutes. *See* 43 C.F.R. § 8340.0–1 *et seq.*

Land use plans (RMPs) contain direction by which "present and future use is projected." 43 U.S.C. § 1701(a)(2); *SUWA,* 542 U.S. at 69, 124 S.Ct. 2373. Because ORV use is one of the multiple uses that BLM provides for and is required to balance against other potential uses to determine the most effective management of the nation's public lands, BLM must designate all public lands within the planning area as either open, limited, or closed to ORVs. 43 C.F.R. §§ 8342.1(a), 8342.2(a), (b). The initial designation of areas as open, limited, or closed to ORVs is accomplished through the resource management planning process, and it must involve public participation and consideration of all viewpoints. 43 C.F.R. § 8342.2(a). The designations must be made to minimize conflicts among the different users of the lands. *See* 43 C.F.R. § 8342.1. In addition, care must be taken to avoid damage to natural resources and to prevent impairment of wilderness suitability. *Id.* Once an RMP is adopted, BLM must "manage the public lands . . . in accordance with the land use plans." 43 U.S.C. § 1732(a).

Short of promulgating or amending an RMP, the resource management planning process does not speak to the manner in which an ORV designation may be changed. As such, and in order to address Executive Order 11989, BLM promulgated a regulation that requires the agency to close areas to ORV use, without resort to the route-designation process undertaken when promulgating or amending an RMP, when the BLM determines that ORVs "are causing or will cause considerable adverse effects" to "soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources." 43 C.F.R. § 8341.2(a). Notably, such closures are nondiscretionary: BLM "*shall immediately close* the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence." *Id.* (emphasis added). "This provision creates a separate duty to close without regard to the designation process; it does not automatically become inoperative once the Secretary exercises his discretion to designate the land." *Sierra Club v. Clark,* 756 F.2d 686, 690 (9th Cir.1985).

BLM's authority to close or restrict the use of public lands notwithstanding the provisions of the governing RMP is not limited to 43 C.F.R. § 8341.2(a). It is also permitted to do so in order "to protect persons, property, and public lands and resources." 43 C.F.R. § 8364.1. An order closing or restricting the use of public lands under this authority must identify the lands that are closed to entry or restricted as to use; specify the uses that are restricted; specify the period of time during which the closure or restriction applies; identify any persons exempt from the closure or restriction; include a statement of the reasons for the closure; and be posted and published as provided in the regulation. 43 C.F.R. § 8364.1(b), (c).

## C. *National Environmental Policy Act*

■ NEPA, 42 U.S.C. §§ 4321–4370f, was enacted in recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment, [and] … the critical importance of restoring and maintaining environmental quality to the overall welfare … of man." 42 U.S.C. § 4331. NEPA mandates that federal agencies, like BLM, assess potential environmental consequences of a proposed action. NEPA is a procedural statute that does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1070 (9th Cir.2002) (internal quotation marks omitted). To carry out the "hard look" requirement, NEPA requires all federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Pursuant to implementing regulations, an agency as a preliminary step may prepare an Environmental Assessment ("EA") to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS. *See* 40 C.F.R. § 1508.9; *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir.2001). "If the EA establishes that the agency's action "*may* have a significant effect upon the … environment, an EIS must be prepared." " *Babbitt,* 241 F.3d at 730 (internal quotations and citations omitted) (emphasis in original). If the proposed action is found to have no significant effect, the agency must issue a finding to that effect ("FONSI"), "accompanied by a convincing statement of reasons to ex-

plain why a project's impacts are insignificant." *Id.* (internal quotation marks omitted).[3]

An EA and/or an EIS is required when an RMP is to be amended. *See* 43 C.F.R. § 1610.5–5. Notwithstanding these mandates, regulations provide for "emergency" exceptions:

> Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

40 C.F.R. § 1506.11. In this way, agencies must comply with NEPA's requirements "to the fullest extent possible." 42 U.S.C. § 4332.

## II. Factual Background

Gardner is an eighteen year resident of LCM and a member of Concerned Citizens for Little Canyon Mountain ("Concerned Citizens"). Concerned Citizens is an unincorporated association, comprised of local homeowners and landowners, miners, and grazers dedicated to protecting their homes, property, mining claims and grazing rights from the adverse effects of ORV use on LCM. Concerned Citizens has over sixty members with broad-based community support in the Little Canyon Mountain area, including Grant County Officials. (Gardner Decl. ¶ 3, March 10, 2008.)

Concerned Citizens seeks to ensure the compatibility of ORV use in populated areas around LCM by taking into account noise, generalized nuisance, and property destruction caused by ORV activity. (Gardner Decl. ¶ 4.) It also advocates for appropriate public land use in situations where urban and wildland use issues interface on LCM. (Gardner Decl. ¶ 4.) Concerned Citizens looks to promote the safety of all users of public land on LCM and to minimize conflicts with ORV use. (Gardner Decl. ¶ 4.)

In accordance with the August 1985 John Day Basin RMP, and the associated Record of Decision, BLM manages approximately 2498 acres of land on LCM. (AR 40–42; Answer ¶¶ 31, 42.)[4] LCM is surrounded by private property on three sides and the Strawberry Mountain Wilderness on the fourth. (Answer ¶ 9; Gardner Decl. Ex. A at 1.)[5] The Strawberry Moun-

---

3. An agency does not have to prepare an EIS or an EA, however, if the action to be taken falls under a categorical exclusion ("CE"). *Alaska Ctr. for the Env't v. U.S. Forest Serv.,* 189 F.3d 851, 853–54 (9th Cir.1999) (citing 40 C.F.R. § 1508.4). "Pursuant to Council of Environmental Quality (CEQ) regulations, each agency is required to identify categories of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.* (citing 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4). The CE procedures developed by agencies "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," 40 C.F.R. § 1508.4, in which case an EIS or an EA/FONSI would be required. At bottom, NEPA "insure[s] a fully informed and well-considered decision," *see Vermont Yankee Nu-*

*clear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), especially when proposed activity may "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

4. "AR" refers to the official Administrative Record lodged with the court by the BLM. (Docket Entry No. 16.)

5. At the time Gardner filed his Motion for Summary Judgment, BLM had not yet filed the Administrative Record in this case. While a number of Gardner's exhibits are part of the AR, to avoid confusion, the court will cite to those exhibits in accordance with the form used by Gardner, rather than the corresponding AR number. Additionally, the exhibits relied upon by Gardner that are not part of

tain Wilderness area is managed by the United States Forest Service. (AR 13 at 62.) LCM is adjacent to private property within Canyon City limits and is less than two miles from the town center. Gardner maintains that private homes, mining claims, waterways, and land holdings are directly impacted by LCM. (Gardner Decl. Ex. A at 1.)

Historically, significant portions of LCM have been mined for gold and the impacts of certain mining practices remain readily apparent today. (AR 13 at 134, 145, 207; Defs.' Mem. Supp. Summ. J. 8 (and citations to the record therein).) LCM has also been used by ORV users since at least 1985 and, currently, there are at least five miles of documented recreational ORV trails for vehicles less than 50″ in width and at least 26 miles of road for those greater than 50″ in width in LCM. (AR 13 at 216; Gardner Decl. Ex. A at 1, Ex. U.) Much of the land in LCM is described as very steep with many of the routes having no built-in drainage. (Gardner Decl. Ex. A at 1.) The soil contains a high amount of clay and the routes rut easily. (AR 13 at 139.) Although routes and trails exist throughout LCM, the BLM notes that one area in particular, referred to as the "pit" and covering just over two acres, is used more often by ORV users because of the riding opportunities it provides. (AR 1, 3, 13 at 139, 120, 139; Welch Second Decl. ¶ 5, May 12, 2008.)

Gardner and other members of Concerned Citizens for LCM who have lived directly adjacent to LCM for many years, report a dramatic increase in ORV use in recent years, including a significant number of ORVs using the area throughout the week and year-round. Additionally, ORV use and related parties occur into the

night. (Gardner Decl. ¶ 2; Pls.' Mem. Supp. Summ. J. Ex. M.) Because of the proximity of the pit, much of the ORV use occurs less than 100 yards from Concerned Citizens members' homes, and directly adjacent to a home for developmentally disabled adults. (Pls.' Mem. Supp. Summ. J. Ex. M at 1; Ex. DD.) As one Concerned Citizens member wrote BLM in September 2006:

> The riding activities have only accelerated since the BLM encouraged the creation of a local riding group and placed barriers to the "pit." This past weekend finds me at the end of my rope as well as many of the other local home owners. The OHV noise disturbance is causing severe psychological and emotional st[r]ess which impacts my job and my family and induces many sleepless nights.

(Pls.' Mem. Supp. Summ. J. Ex. M at 1.)

As mentioned above, BLM's management direction for LCM is currently provided by the John Day Basin RMP, which was issued in August 1985, following the completion of both a draft and final EIS. (AR 40–42; Answer ¶ 31.) Pursuant to FLPMA, the John Day Basin RMP designates land within a planning area such as LCM as open, limited, or closed. (AR 40 at 858, 860, 887; AR 42 at 1009.) The RMP designated LCM as open to ORV use year-round. (Answer ¶ 42.) An open designation means an "area where all types of vehicle use is permitted at all times, anywhere in the area subject to the operating regulations and vehicle standards set forth" in 43 C.F.R. Subparts 8341 and 8342. 43 C.F.R. § 8340.0–5(f).

Recognizing that the John Day Basin RMP is over 20 years old, BLM has "set a

---

the official AR will be considered by the court as unopposed by BLM or, alternatively, as proper under the Ninth Circuit's decision in *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 665 (9th Cir.1998) ("where the issue is alleged agency inaction, we believe the scope of review . . . is broader").

goal of issuing a final environmental impact statement and revised final RMP before October 1, 2009...." (Answer ¶ 34; Gardner Decl. Ex. B at 2, Ex. E; Pls.' Mem. Supp. Summ. J. Ex. J at 1, Ex. BB.) Nevertheless, until a revised John Day Basin RMP issues, LCM remains open to ORV use under the 1985 plan. (Answer ¶ 42.)

In 2003, in response to both BLM's and local citizens' concerns over fire risk and forest health, BLM completed the LCM Fuel Reduction EA for a proposal addressing fuel reduction to LCM. (AR 13; AR 33–39; Welch Second Decl. ¶ 3.) BLM determined that implementation of the Fuel Reduction Project would not have a significant environmental impact on LCM and, accordingly, issued a FONSI. (AR 13.) According to Gardner, however, BLM identified multiple environmental impacts from ORV use in LCM in the Fuel Reduction Project. (Pls.' Mem. Supp. Summ. J. 5 (and citations contained therein).) Specifically, under the "Analysis of Effects" for "Recreation and OHV Use" set forth in § 4.2.6, the BLM states in reference to the "open" classification that:

> This type of land allocation produces many different potential impacts to other resources.
>
> OHV users have the potential to disturb wildlife, impact soils and damage sensitive riparian sites.
>
> Cross-country travel by OHV users also has the potential to disturb archeological sites. OHV riders currently use some of the historic mining ditches as routes. In some instances, this has the potential to compromise the integrity of historic sites.
>
> The routes that currently exist were not designed or laid out to prevent erosion or sedimentation. Currently water runoff and OHV tire spin combine to create ruts in the steep trails. As ruts get worse and trails become nonnegotiable, riders continue to move to the side of the trail, widening the trail and increasing the potential impacts. In some cases, old routes many be abandoned and new routes created to go to the same location.
>
> Garbage dumping is another problem that would continue. The presence of garbage tends to encourage more garbage dumping and would be expected to increase in this area without attention.
>
> A catastrophic fire would, in some cases, obliterate current routes because some are defined by a lack of vegetation. If there were no vegetation (shrubs, grasses, etc.) across the landscape some routes would disappear. However, the lack of vegetation could also promote new OHV routes. In some areas, the reason there are no routes currently is simply because there was too much vegetation to navigate through. If the vegetation were removed, sight distance would be opened up and OHV users would be able to see more areas that they could traverse.
>
> Over time it is likely that there would be a substantial amount of erosion, several miles of new routes and many more parallel routes, all of which would be used by substantially more riders than there are currently.

(AR 13 at 162–63.)

In a Decision Record for the Fuel Reduction Project, signed by BLM and dated September 4, 2003, BLM set forth forest vegetation treatments designed to reduce hazardous fuels and improve longer-term forest health, and measures to limit the access of vehicles greater than 50 inches in width to the pit. (AR 11; Welch Second Decl. ¶ 3.) By installing guardrails and other barriers, the pit would be closed to vehicles greater than 50 inches in width to prevent the area from continuing to be used as a dump site. (AR 11 at 28–29;

Welch Second Decl. ¶ 3.) Additionally, a buffer around the pit of 100 to 250 feet would be created to mitigate potential increased ORV use if the area around the pit were thinned and ORV user's line of sight increased. (AR 11 at 28–29.)

Gardner alleges that completion of the Fuel Reduction Project brought a dramatic increase in recreational ORV use. (Gardner Decl. Ex. A at 1, Ex. CC.) Since at least January 2004, Gardner and other members of Concerned Citizens have detailed their concerns regarding noise, safety, user conflicts, and environmental degradation to BLM. (Gardner Decl. Ex. C; Pls.' Mem. Supp. Summ. J. Exs. N, O, P, Q.). While it is undisputed that BLM has received dozens of complaints from adjacent landowners regarding ORV and other human uses in LCM, (AR 55–119; Welch Second Decl. ¶¶ 5, 8–9), the record reveals that BLM has attempted to respond to the concerns raised by adjacent landowners by: (1) meeting with interested members of the public; (2) conducting site visits; (3) convening an alternative dispute resolution process; and (4) working with the State of Oregon's Parks and Recreation Department to educate the public on ORV use. (Defs.' Mem. Supp. Summ. J. 10 (and citations to the record therein).)

In June 2006, the Concerned Citizens for LCM formally petitioned BLM "to immediately close [ ] BLM land on Little Canyon Mountain to all recreational Off Road Motorized Vehicle (ORV) use pursuant to Executive Order 11644 and 11989; Code of Federal Regulations (CFR) 43:8342.1(a), (b), (c), (d): CFR 43:8342.2(a), (b), (c): CFR 43:8342.3 . . . ." (AR 94.) In response to the Petition, BLM's Field Manager for the Central Oregon Resource Area, Christina Welch noted that the 1985 Record of Decision designated LCM as open to OHV use year-long. Additionally, the John Day Basin RMP and EIS specifically stated: "Designate and fence a specific area above Canyon City for intensive ORV use, especially motorcycles." (AR 93.) BLM denied Concerned Citizens petition to immediately close LCM to ORV use. That denial was not challenged by the Concerned Citizens.

In a letter to Teresa Gardner regarding continued ORV use, date stamped February 12, 2007, Welch, acknowledged, in part:

First, it is clear that our location of the staging area immediately adjacent to the Marysville Road has caused both social conflicts and safety hazards. Our purpose in placing barriers to vehicles wider than 50 inches was to reduce or eliminate the illegal dumping of garbage that has occurred in past years while still allowing ATV use. The unintended consequences of that action are that it has become a congregation area for users right on the road; some of the users illegally "jump" onto the road or drive across onto adjacent private property. Additionally, the noise from ATV's is closer to the neighbors and has increased those conflicts. A number of people interviewed [by BLM] indicated it is essential to fix those problems by providing different access and discontinuing use at the current staging area [sic] unusable. I plan to do that in the hopes of preventing any future accidents and to reduce the social conflicts.

(AR 51.)

In 2007, BLM learned of altercations between ORV users and adjacent LCM landowners, along with other incidents such as an ORV rider who jumped onto the county road and was struck by a motor vehicle. In response, BLM issued restrictions to vehicle use and access to the area between the pit and the nearby county road. (AR 3–4; Welch Second Decl. ¶ 11.) The restrictions were issued to "provide for public safety." (AR 4.) Subsequently,

this restriction and closure was modified slightly. (AR 1; Welch Second Decl. ¶ 14.) BLM insists that the closure and use restriction was not undertaken in response to any sort of environmental or natural resource degradation. Rather it was based on BLM's public health and safety concerns related to the altercations between ORV users and neighbors and potential traffic safety issues resulting from ORV users riding around the portion of LCM near the county road. (AR 1–4; Welch Second Decl. ¶¶ 11, 13–14.) In addition to the emergency restrictions, the BLM initiated a formal alternative dispute resolution process to facilitate discussion among the disputing parties. BLM is engaged in an ongoing NEPA process to analyze revision to the John Day Basin RMP with recommendations from various parties including Concerned Citizens. (Welch Second Decl. Par 16; AR 45 and 47). The major issue of ORV use on LCM was not resolved through the alternative dispute resolution process. This complaint was filed to challenge the failure of BLM to disallow use of ORVs on LCM.

## Legal Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999).

## Discussion

As noted above, Gardner's challenges are brought under the judicial review provisions of the APA. When a plaintiff seeks to challenge agency inaction, section 706(1) of the APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In Counts II and III of his Complaint, Gardner challenges agency inaction pursuant to section 706(1); namely, BLM's failure to make a determination of considerable adverse effects and close LCM to ORV use. In instances where plaintiff seeks review of an agency's decision, section 706(2)(A) of the APA allows a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" In Count I of his Complaint, Gardner challenges agency action pursuant to section 706(2); namely, BLM's decision not to close LCM to ORV access pursuant to the Fuel Reduction EA.

Gardner's claims against BLM for its failure to act are controlled, in part, by the Supreme Court's 2004 decision in *SUWA* that interpreted the scope of a section 706(1) remedy. SUWA, an environmental non-profit corporation, filed a complaint seeking "declaratory and injunctive relief for BLM's failure to act to protect public lands in Utah from damage caused by ORV use." *Id.* at 60, 124 S.Ct. 2373. The three claims asserted by SUWA were that BLM had: (1) violated its mandate under FLPMA, 43 U.S.C. § 1782(c), to "continue to manage wilderness study areas ... in a manner so as not to impair the suitability of such areas for preservation as wilderness[,]" by failing to take action to prevent degradation of wilderness study areas ("WSA") by ORV use; (2) violated the provisions of a RMP that committed the

agency to monitor ORV use and, when appropriate, close WSAs to such use, thereby contravening the requirement of 43 U.S.C. § 1732(a) that "[t]he Secretary shall mange the public lands ... in accordance with the land use plans ... when they are available[,]"; and (3) violated NEPA by failing to prepare a supplemental EIS to account for the increase in ORV use that occurred subsequent to the announcement of the initial RMP. 542 U.S. at 60–61, 124 S.Ct. 2373.

After first considering the limits the APA places upon judicial review of agency inaction, the Court determined that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64, 124 S.Ct. 2373 (emphases in original). Applying that test to SUWA's first claim for violation of the nonimpairment mandate, 43 U.S.C. § 1782(c), the Court held that the district court lacked jurisdiction under section 706(1) to compel BLM to take action because section 1782(c) while "mandatory as to the object to be achieved ... leaves BLM a great deal of discretion in deciding how to achieve it." *Id.* at 66, 124 S.Ct. 2373.

The Court also rejected SUWA's second claim, that BLM's failure to monitor ORV use violated promises made in the RMP's that ORV use "will be monitored and closed if warranted[,]" 542 U.S. at 68, 124 S.Ct. 2373. The Court held that "allowing general enforcement of plan terms would lead to pervasive interference with BLM's own ordering of priorities." *Id.* at 71, 124 S.Ct. 2373. Thus, BLM's failure to under-

take an action promised in an RMP did not violate FLPMA's requirement that BLM manage lands "in accordance with" land use plans under 43 U.S.C. § 1732(a), because "a land use plan is generally a statement of priorities; its guides and constrains actions, but does not (at least in the usual case) prescribe them." *Id.* at 71, 124 S.Ct. 2373. With these principles in mind, the court will review first the allegations in Counts II and III of Gardner's Complaint against BLM for failures to act.

With respect to SUWA's third claim under NEPA, the Court determined that BLM did not violate NEPA by failing to take a "hard look" to consider whether it should prepare a supplemental EIS on RMPs for areas experiencing increased ORV use. 542 U.S. at 72, 124 S.Ct. 2373. In reaching this conclusion the Court rejected SUWA's argument that evidence of increased ORV use was a "significant new circumstance[ ] or information" requiring a "hard look." *Id.* at 73, 124 S.Ct. 2373 (quotations and citations omitted). Rather, the Court determined that a land use plan was not an "ongoing 'major federal action' that could require supplementation...." *Id.* at 73, 124 S.Ct. 2373 (quoting 42 U.S.C. § 4332(2)(C)). As in *SUWA*, this court will address Gardner's NEPA claims separately from the FLPMA claims.

## I.  Claims Under FLPMA:

### Count II—FLPMA and Count III—Violation of OHV Regulations [6]

Gardner challenges BLM's failure "to act effectively to eliminate or prevent the

---

**6.** In Count III of his Complaint, Gardner references Executive Orders 11644 and 11989, as additional direction and authority for federal agencies to control OHV use. (Compl. ¶ 67.) Gardner acknowledges, however, that the federal regulations set forth in 43 C.F.R. §§ 8340–42 "implement, and largely restate, the planning, informational, and monitoring

requirements of the Executive Orders." (Compl. ¶ 71.) Additionally, Gardner does not allege a violation of these Executive Orders in his Complaint. Accordingly, the court's analysis with respect to Count III of Gardner's Complaint will focus on the regulations relied upon by Gardner in his Complaint and other pleadings filed with the court.

adverse effects caused by ORV use as mandated by law." (Pls.' Mem. Supp. Summ. J. 18.) Specifically, Gardner maintains that there is "ample evidence of significant undue and unnecessary degradation in the form of considerable adverse effects on the soils and vegetation in the LCM area." (Pls.' Mem. Supp. Summ. J. 18–19.). Gardner argues that BLM is required by law to act immediately to prevent the adverse effects and its failure to do so violates FLPMA and its implementing regulations.

Section 1732(b) of FLPMA requires that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. 1732(b). In particular to ORV use, FLPMA provides that:

> where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the authorized officer shall immediately close the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

43 C.F.R. § 8341.2(a).

Gardner relies on this provision to argue that BLM has a duty, independent from its obligations with respect to RMPs, to close public lands when ORV use interferes with other uses and interests. *See Clark,* 756 F.2d at 690 (Section 8341.2(a) "creates a separate duty to close without regard to the designation process; it does not automatically become inoperative once the Secretary exercises his discretion to designate the land.") Gardner insists that by failing to act and prevent degradation to LCM, BLM violated mandatory duties and its

inaction constitutes agency action unreasonably delayed or unlawfully withheld under section 706(1) of the APA.

BLM acknowledges its duty to close an area to ORVs under certain conditions, i.e., once a determination is made that certain adverse effects are occurring. It maintains, however, that the Supreme Court's decision in *SUWA* bars this court from compelling BLM to take action and close LCM to ORV use. 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137. Additionally, BLM contends that even if the court has authority under the APA to compel BLM to act, there is insufficient evidence in the record to mandate ORV closure across the 2500 acre LCM.

■ The court agrees with BLM that Gardner's claim under section 1732(b) of FLPMA is barred just as claims under 1732(a) and (c) were barred by the Supreme Court's decision in *SUWA*. Even assuming the terms of section 1732(b) provide a mandatory duty on the part of an agency such as BLM to manage LCM in a manner that prevents impairment to the land, BLM retains discretion in deciding the appropriate *manner* for achieving that objective. *See SUWA,* 542 U.S. at 66, 124 S.Ct. 2373 (emphasis added) (BLM has "a great deal of discretion in deciding how to achieve" the mandatory nonimpairment objective of section 1782(c)). Similarly, section 1732(b) uses broad language and requires simply that an agency take action "to prevent unnecessary or undue degradation of the lands." Gardner does not offer, nor is the court able to make, a distinction on principle between the language of section 1782(c)—"so as not to impair the suitability of such areas for preservation as wilderness"—and that of section 1732(b)—"prevent unnecessary or undue degradation of the lands". The requirement for discrete agency action set forth in *SUWA* applies with full force to a

plaintiff's section 1782(c) claim, and should be not be disregarded under a section 1732(b) claim.

Further, among other relief, Gardner requests that the court enter "[a]n injunction ordering [BLM] to take action to restore the Little Canyon Mountain area to its natural and healthy condition as it existed prior to the undue and unnecessary degradation caused by excessive OHV use." (Compl. 12.) Simply put, Gardner, like plaintiffs in *SUWA*, asks the court to "enter [a] general order compelling compliance with broad statutory mandates." *SUWA*, 542 U.S. at 66, 124 S.Ct. 2373. The Supreme Court has made it clear that:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.... The prospect of pervasive oversight by federal courts over the

manner and pace of agency compliance with such congressional directives is not contemplated by the APA,

*Id.* at 66–67, 124 S.Ct. 2373. Section 1732(b) lacks the specificity requisite for agency action under the APA and the Supreme Court's decision in *SUWA*. Accordingly, this court does not have jurisdiction under section 706(1) to enjoin ORV use in LCM and compel BLM to act.

▪ Turning next to Gardner's argument that 43 C.F.R. § 8341.2(a) provides the specificity needed and distinguishes this case from the decision in *SUWA*. Gardner contends that once BLM determined ORV use was causing adverse effects, as it did here,[7] it was required to close LCM to ORVs. *See* 43 C.F.R. § 8341.2(a) ("where the authorized officer determines [ORVs] are causing or will cause considerable adverse effects ... the authorized officer shall immediately close the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence ...."); *see also* 43 C.F.R. § 8342.3 (the agency "shall monitor effects of the use of ORVs on public land").[8] According to Gardner,

7. Gardner's argument that BLM ignored its own determination that ORV use was causing considerable adverse effects is contradicted by ¶ 79 of his Complaint in which he alleges "[d]efendant has never analyzed the effects of OHV use in the LCM area, despite legal requirements to do so." (Compl. ¶ 79.) Moreover, in her declaration, Welch stated unequivocally that she has "not determined that any area within LCM is suffering or has suffered such considerable adverse effects on the resources listed in 43 C.F.R. § 8341.2 that would justify immediate closure of an area to one or more particular types or ORVs pursuant to that regulation." (Welch Second Decl. ¶ 17.)

8. The court notes that although Gardner references section 8342.3 in his Complaint, he has not set forth any argument or analysis to support his claim that BLM failed to monitor

the effects of ORV use of LCM. Moreover, there is evidence in the record that BLM has monitored such use. For example, in her declaration Welch detailed efforts by BLM both to monitor ORV use at LCM and facilitate resolution of disputes between homeowners and ORV users. (Second Decl. Welch; see also Defs.' Mem. Supp. Summ. J. 20–21.) Nor did Gardner attempt to refute BLM's assertion that it has satisfied its obligations under section 8342.3. In fact, neither Gardner's Reply Brief or his Supplemental Brief even reference section 8342.3. Additionally, Gardner has not offered competent evidence to dispute BLMs claim that is has complied with its monitoring requirements under section 8342.3. Finally, even if Gardner were to prevail on his section 8342.3 claim, there is no authority under that provision for the court to grant the requested relief—closure of LCM to ORV use.

"[i]n the fuels management EA, [BLM] acknowledged and identified multiple environmental impacts from ORV use in the LCM. . . ." (Pls.' Mem. Supp. Summ. J. 19 (and citations contained therein).) As such, Gardner argues, BLM was required "to close [LCM] to ORV use while it studie[d] the problem" . . . . and "until the adverse effects [were] eliminated and measures implemented to prevent recurrence." (Pls. Reply Brief 4–5.) The court does not agree that it should order BLM to close LCM to ORV use.

In *Clark*, 756 F.2d 686, environmental plaintiffs alleged that defendants' failure to close Dove Springs Canyon to all ORV activity violated Executive Order No. 11989 and 43 C.F.R. § 8341.2, and that ORV use would continue to cause adverse effects in the Canyon in the future. *Id.* at 689. The issue for the Ninth Circuit was whether the damage caused by ORV use to Dove Springs Canyon amounted to "considerable adverse effects" that required closure of the Canyon. *Id.* at 690. Because the parties agreed on the extent of the damage to the Canyon (severe), resolution of the issue depended upon whether the Secretary's or Sierra Club's interpretation of that phrase would control. *Id.* Despite the parties' agreement that the environmental impact of ORV use at Dove Springs was *severe*, the Ninth Circuit found that "the Secretary's determination that these effects were not 'considerable' in the context of the Desert Area as a whole [was] not arbitrary, capricious, or an abuse of the broad discretion committed to him by an obliging Congress." *Id.* at 691 (emphasis added). In reaching this conclusion, the court noted that the Secretary was vested with substantial discretion in the administration of public lands. *Id.*

Similarly, here, environmental plaintiffs must allege an actionable duty—a discrete, legally required action. A claim or allegation for generalized deficiencies in a statu-

tory or regulatory mandate will likely be inadequate under *SUWA*. While Gardner's allegations under section 8341.2(a) provide a more compelling argument for the court's analysis, that claim must fail. There is no evidence in the record that BLM has made a contemporaneous determination that ORVs "are causing or will cause considerable adverse effects upon" the enumerated resources. Indeed, in her declaration, Welch stated unequivocally, that she has "not determined that any area within LCM is suffering or has suffered such considerable adverse effects on the resources listed in 43 C.F.R. § 8341.2 that would justify immediate closure of an area to one or more particular types or ORVs pursuant to that regulation." (Welch Second Decl. ¶ 17.) It appears that Gardner disagrees with such a determination based upon certain evidence he cites in the administrative record. He claims BLM's failure to make such a determination violates 8341.2(a).

■ However, BLM's determination of no considerable adverse effects to the enumerated resources is entitled to considerable deference. *Clark*, 756 F.2d at 690–92. Indeed, even when the Secretary was aware of severe effects on the environment in *Clark*, closure could not be mandated by the court. *Id.* Additionally, Gardner has failed to put forth evidence to support a finding of "considerable adverse effects" to one of the protected resources. Gardner has not submitted any independent scientific or expert reports to contradict or refute BLM's position of no considerable adverse effects. Rather, Gardner simply asks this court to accept his interpretation of the evidence over the interpretation of the agency and its experts. Such action by the court would violate clearly established law. *See, e.g., Clark*, 756 F.2d at 690–92 (Secretary's not Sierra Club's interpretation of the phrase "no considerable adverse

effects" controlled). It is clear from the Ninth Circuit's decision in *Clark*, that the BLM has substantial discretion when managing public lands and its determination regarding insufficient evidence of "considerable adverse effects" to one or more of the referenced resources must be upheld.

Additionally, the decision to open LCM to ORVs was made in 1985, and there has been no subsequent final action by BLM that would provide a basis to mandate closure. Nor has BLM issued a recent finding of no adverse impacts that could be challenged by Gardner. *Compare Clark*, 756 F.2d at 688–89 (Sierra Club sought court ordered closure under section 8341.2 after its petition for closure was deferred until Secretary issued a Final Plan maintaining unrestricted use of Canyon). Although BLM did deny Gardner's petition to close LCM to ORV use, Gardner has not framed his FLPMA claim as a challenge to the denial of the petition. (Compl. ¶¶ 59–60, 78–79.) Rather, Gardner contends BLM failed to act in accordance with FLPMA regulations by failing to make a finding of "considerable adverse impacts" and now asks the court to make such a finding and compel closure of LCM to ORVs. Such a request is contrary to both section 706(1) and the Supreme Court's decision in *SUWA*.

Section 8341.2(a) supplies BLM the discretion to decide when and how a determination of "considerable adverse effects" will be made. In this court's view, that regulation "does not mandate, with the clarity necessary to support judicial action under § 706(1), the total exclusion of ORV use." *SUWA*, 542 U.S. at 66, 124 S.Ct. 2373. For example, section 8341.2(a) does not direct an agency to make a determination under certain conditions or instances or at particular intervals or triggering events. Rather, the regulation simply provides that where such a determination is made, with both process and timing left

entirely to an agency's discretion, closure is mandated. *See* 43 C.F.R. § 8341.2(a). BLM has not determined that ORV use is causing considerable adverse effects to the enumerated resources and this court lacks authority either to mandate such a finding or to close LCM to ORV use.

In sum, the court lacks any authority pursuant to 706(1) to allow Gardner's FLPMA claims. As set forth above, BLM has not made a determination of considerable adverse impacts and there is no clear statutory mandate, i.e., discrete agency action required by law, to support Gardner's claims under FLPMA and the ORV regulations. This is simply not a case in which an agency failed to take a discrete action required by law. Instead, Gardner and other residents, frustrated with their perceived harm to the LCM and continuing interference with the enjoyment of their residences cause by ORVs, are seeking relief by alleging BLM's failure to act. While this court is sympathetic to the homeowners' plight—the nuisance created by ORV use and the difficulties in seeking appropriate redress—the court must be careful not to construe a claim grounded in the dissatisfaction with the scope or nature of an agency's actions as failure to act subject to a section 706(1) remedy. Nor can the court excuse Gardner from the finality requirement of 706(2), by entertaining a complaint about the adequacy of BLM's actions under 706(1) for a failure to act. As the Ninth Circuit explained, plaintiffs should not be allowed "to evade the finality requirement with complaints about the sufficiency of an agency action dressed up as an agency's failure to act." *Ecology Ctr., Inc. v. United States Forest Service*, 192 F.3d 922, 926 (9th Cir.1999) (quotations and citation omitted) (Forest Service's failure to comply with monitoring and reporting requirements under NFMA was not final agency action reviewable under § 704 of the APA); *see also Shawnee*

*Trail Conservancy v. Nicholas*, 343 F.Supp.2d 687, 704 (S.D.Ill.2004) (SUWA barred a suit to compel the Forest Service to determine appropriate levels of all terrain vehicle use). Accordingly, BLM's request for summary judgment against Gardner's claims under FLPMA and the ORV regulations, Counts II and III, should be granted and Gardner's motion for summary judgment should be denied.

## II. Claim Under NEPA:

### Count I—NEPA

In Count I of his Complaint Gardner alleges that the "LCM Fuel[ ] Reduction EA failed to adequately analyze the likely impacts of OHV use and the effect of closing certain areas to OHV access while keeping others open, and the direct, indirect, and cumulative impacts of these and other foreseeable actions on wildlife, air, soils, vegetation, and neighboring private property." (Compl. ¶ 53.) Specifically, Gardner maintains that BLM failed to prepare a NEPA document that "fully disclose[d] and analyze[d] likely direct and indirect impacts of the fuels management project ... on ORV use in the area." (Pls.' Mem. Supp. Summ. J. 24.) According to Gardner, "the Fuel[ ] Reduction EA did not adequately analyze the impacts of increased ORV use due to increased accessibility to previously heavily brushed and forested areas, the effect of closing certain areas to ORV access (such as closing "the pit" to Class II vehicles) while keeping others open (such as the parking lot area that has turned into a ORV play area), and the direct, indirect, and cumulative impacts of these actions on wildlife, air, soils, vegetation, other recreational users of the area, and neighboring private property." (Pls.' Mem. Supp. Summ. J. 24.) Accordingly, Gardner maintains that BLM's decisions with respect to the Fuel Reduction EA were arbitrary and capricious and not in

accordance with the law. *See* 5 U.S.C. § 706(2).

BLM explains that the Decision Record was issued on September 4, 2003, (AR 11), and the portion of the project restricting access to the pit was completed in August 2006, with the entire project being completed in December 2007. (Welch Second Decl. ¶ 6.) As part of the Decision Record, BLM also indicated it would restrict access to the pit for larger vehicles, in order to reduce the dumping of garbage on public lands. (AR 11 at 28–29; AR 12 at 32; Welch Second Decl. ¶¶ 3–4.)

As such, BLM contends that Gardner's claim challenging the Fuel Reduction Project EA is moot because the timber thinning and other activities encompassed by the decision have been fully implemented and there is no effective relief that can be ordered. *See Headwaters v. BLM*, 893 F.2d 1012, 1015 (9th Cir.1990) ("The adverse effect ... must not be so remote and speculative that there is no tangible prejudice to the *existing interests* of the parties." (internal quotations and citations omitted)); *accord Feldman v. Bomar*, 518 F.3d 637, 642–43 (9th Cir.2008). *But see Or. Natural Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 821 (9th Cir. 2006) (finding that "an appropriate [Environmental Assessment] can yield effective post-harvest relief" for challenges to a timber harvesting project). Further, BLM explains that presently it is engaged in an RMP planning process to analyze ORV impacts to LCM under various alternatives, including a no-action alternative. (AR 8 to 9; Welch Second Decl. ¶¶ 7, 18 (BLM "expects to issue a Record of Decision for its revised John Day Basin RMP late in calendar year 2009").) Accordingly, BLM insists it is already moving forward with the NEPA process that Gardner requests this court to order.

The court need not determine whether Gardner's claim under NEPA is moot because it is clear that under Ninth Circuit law, BLM's analysis of ORV impacts due to the Fuel Reduction Project was adequate. Section 706 of the APA governs judicial review of NEPA. 5 U.S.C. § 706; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir.2004) ("Because the statutes ... do not contain separate provisions for judicial review, our review is governed by the APA."). It is well established that the scope of judicial review under section 706(2) is narrow, and a court must uphold an agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Further, an agency's decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.2008) (*en banc*) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir.2006))[9]. If the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the court must uphold the agency's action. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see also City of Sausalito*, 386 F.3d at 1206.

Moreover, the court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *See Balt. Gas & Elec. Co.*, 462 U.S. at 103,

103 S.Ct. 2246. It should not "act as a panel of scientists that instructs the [agency] ..., chooses among scientific studies ..., and orders the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988. The court should also "conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise ... as long as they are reasonable.'" *Id.* at 993 (quoting *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C.Cir.2006)). Finally, "'[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Id.* at 1000 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

Here, BLM analyzed the impacts from ORV use in both the Fuel Reduction EA and Appendix I (ORV Specialists Report), including the impacts—both direct and indirect—of six distinct alternative approaches to managing ORV use in LCM that ranged from no action to increasing or restricting ORV use. (AR 13 at 71–112, 139–40, 162–63, 171, 178, 185, 194, 200–01, 205, 216; AR 22 at 465–77; AR 30 at 723–27.) Ultimately, BLM determined that the pit area would be closed to vehicles greater than 50 inches in width, as described in Alternative D, and leave a forest buffer around the pit, as described in Alternatives D and F. (AR 11 at 28.) Additionally, barriers were placed at the pit entry to prevent access to vehicles larger than 50 inches in width; and a 100 to 250 foot vegetated buffer between the pit and surrounding areas was retained. (AR 11 at

---

**9.** Gardner's attempt to distinguish *Lands Council* is unpersuasive as the court in that case fully analyzed the substantive issues and reaffirmed the standard of review under the APA and NEPA.

28.) BLM reasoned that closing access to vehicles greater than 50 inches in width would eliminate dumping concerns and retaining the forested buffer would assist with managing ORV use and provide a sound and sight barrier between the pit and surrounding areas, thereby mitigating some of the identified impacts. (AR 11 at 28–29; AR 12 at 32; AR 13 at 143, 158–59.) The rationale for implementing these Alternatives was set forth in both the Decision Rationale Letter for EA (AR 12) and the Record of Decision (AR 11).

Additionally, the court notes that evidence in the record establishes that the Fuel Reduction Project was undertaken by BLM solely to manage the risk of an uncontrollable wildfire and deteriorating forest health in LCM and not in response to concerns over degradation to natural resources. The EA was intended to analyze alternatives for managing vegetation to address the forest health risks. The Record of Decision reflects BLM's intent to reduce hazardous fuel and improve, overtime, forest health. The additional objective to prevent the pit from being used as a dump site was also achieved. Further, as *Lands Council* recently instructed, "we are not free to impose on the agency our own notion of which procedures are best. . . . Nor may we impose procedural requirements not explicitly enumerated in the pertinent statutes." 537 F.3d at 993 (citations and internal quotation marks omitted). In preparing the Fuel Reduction EA, BLM was not required "to conduct any particular test or to use any particular method, so long as the 'evidence . . . provided to support [its] conclusions, along with other materials in the record,' ensure that the agency 'made no clear error of judgment that would render its action arbitrary and capricious.'" *League of Wilderness Defenders–Blue Mountains Biodiversity Project v. U.S. Forest Service*, 549 F.3d 1211, 1218 (9th Cir.2008) (quoting *Lands Council*, 537 F.3d at 993).

Once again the court notes that Gardner does not offer independent scientific evidence or analysis to challenge BLM's Fuel Reduction EA. Instead, Gardner asks the court to adopt his own interpretation of the environmental evidence and his assessment of the agency's obligations over those of BLM's. Not only is such a request contrary to well established law, but such a ruling would transfer the management of public lands from the Congressionally designated agency to discrete groups of individuals, subject to their own private interests. Undoubtedly, BLM was bound by law to determine the impact of Fuel Reduction Project, however, it is neither this court's nor Gardner's role to dictate the method and outcome of that undertaking. Nor is it reasonable to task BLM with a requirement to consider, analyze and document in detail every aspect of individual homeowner's concerns and impacts, regardless of the larger public impact, and it is not mandated by statute.

In sum, it was within BLM's discretion to determine the optimal method for analyzing ORV impacts in the Fuel Reduction EA process, provided it gave the environmental impacts the required "hard look." *Lands Council*, 537 F.3d at 1003. Based on the record before this court, BLM's actions and decisions with respect to the Fuel Reduction EA and ORV use on LCM was not arbitrary and capricious. Accordingly, BLM's request for summary judgment against Gardner's claim under NEPA should be granted and Gardner's motion for summary judgment should be denied.

*Conclusion*

Based on the foregoing, Gardner's Motion for Summary Judgment (doc. # 5) should be DENIED; and BLM's Cross–Motion for Summary Judgment Pursuant to the APA (doc. # 18) should be GRANT-

ED. Gardner's Complaint (doc. # 1) should be DISMISSED with prejudice.

Dated this 11th day of March 2009.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **March 25, 2009.** If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.